is the court. My name is Dominic Gentile. I'm here on behalf of Frank D'Augustino. We received a notice from the court on Friday that we should be prepared to address the Florida v. Nixon case and its impact on the ineffective assistance of counsel claim for the essentially the concession of guilt on two counts. And I would like to start with that and proceed from there. I think it's helpful to, in the analysis of Florida v. Nixon, to recognize what the cert petition was granted for in that case. It reads, whether counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial automatically renders counsel's performance deficient. There's a lot of component parts to that cert. Then the court got to the step of whether counsel's effectiveness should be controlled or essentially evaluated by the chronic standard or by the Strickland standard. So it was really a very narrow case that came before the court. It may be a narrow case before it came to the court, but we have to deal with the opinion that the Supreme Court gives us. It was an 8-0 opinion, so there wasn't much doubt where they were going. There, the — there was a confession of two — of all of the issues dealing with noncapital punishment. And they say that's very fine in a case like this, that strategy is used to save the person's life. I think the lawyer's an honest lawyer. Here, there was two. Now, when you have that case, doesn't that pretty well set aside your argument that there's an automatic reversal, automatic per se prejudice? I don't think we need to get to that issue here, and I don't think that it automatically sets it aside, and I am prepared to address it, Judge Wallace. Clearly, the lawyer that tried the case in Nixon was an experienced capital punishment lawyer from the defense side. And clearly, the facts in that case, given the confessions and all of the direct evidence, including eyewitnesses, that lawyer faced an overwhelming situation. And what he wanted to do, appropriately so, is to preserve his reputation and his credibility for the only part of the case that he thought he could be of any use to that defense. Why isn't that — Well, that differs from this. Yeah. Because here he — excuse me — here he had the straight — I mean, the arson was an easy thing to concede. Not that Frank D'Augustino committed the arson. Not on the facts of this record. The two key witnesses in this case were Rose Lakel and Anthony Wells. And although the response brief filed by the State indicates that Anthony Wells was called as a defense witness, he was not. And I think that counsel is prepared to concede that. Both of those witnesses were called by the State. There was no — there was direct evidence of an arson because they found that it was a fire that was started. But there was no direct evidence as to who committed it. The only evidence as to who committed it came from the testimony of Wells and Lakel, and that only deals with essentially preparation for an arson. The problem here, and where the real prejudice — actual prejudice resulted here in this concession, is that by conceding the larceny, he — Mr. Wolfson basically provided the State with the motive for the murder. And by — and the conviction of the murder and by conceding the arson, he provided the State with an acknowledgment that his client did something to cover up the evidence, a tacit admission of guilt, consciousness of guilt. And so, in my opinion, for what little that may be worth, at that point in time, he ceased to be an advocate at all with respect to Mr. D'Augustino, at least as to those two parts of the case. He was essentially advocating for his conviction. Now, when he did that, not only did he provide the motive, but if you look at the facts of the case, you see that the testimony that supported the arson and the testimony that supported the grand larceny came from these two witnesses, Lakel and Wells, two witnesses that he had to discredit in order to prevail on the murder charge. And what does he do by conceding the arson and conceding the grand larceny? He essentially concedes their credibility. Now I will grant you that there are some lawyers who believe that they can pick and choose in terms of when to believe somebody and when not to. But in the context of most trials, someone is either believable or they are not. And it is a futile — you make a futile attempt when you try to tell a jury that you're so smart, you know when they're telling the truth and you know when they're not. And so actual prejudice resulted here. I understand your argument. But in your brief, you say that Cronic is our guiding star on how we're to develop this particular issue. I don't think it is anymore. Okay. So you can say that Florida against Nixon is the case we look to? Florida against Nixon and Thomas, which our circuit, of course, and — Well, your argument is that it doesn't change anything. I think that you can — I think that you can take the Strickland test, the Strickland standard, and apply it to the second level that you get to in the analysis here. The question is presented to us in the matter court, the applied Strickland standard.  And your view is they applied it incorrectly. Is that correct? I don't — let me — yes, I say that. But let me explain. I believe that you need to reach three issues. The first issue is a no-brainer from my point of view. The record is clear. It is unrebutted that Mr. Wolfson never discussed this strategy with Frank D'Augustino. And so I believe that Nixon and Thomas — perhaps it's only — in Thomas, the opinion of the Court was that they assumed prejudice. You never really reached the issue as to all three judges that sat on that Court. Two of the judges wrote a concurring opinion, and other — another panel of this circuit in an unpublished opinion sort of adopted — Well, that doesn't get you anywhere. I understand. But be that as it may, at least there's — there seems to be agreement amongst some pretty good lawyers who wear robes and are judges that the — that the — that a lawyer has a duty when he's going to concede guilt at a trial to discuss it with his client. Was this argued in your case? Where have you raised that issue in your brief? Where did you raise the issue? This is the first time, at least, I've seen it. I may have missed something. We did not raise the issue. All right. Let's go on to Rose Lagle, then. What's your point about her? It seems that she — your view is that she had a deal going into the trial for benefits that weren't made available to the defense, and therefore she committed perjury and the prosecution failed in its responsibilities under Brady and Giglio. Is that right? Giglio, yes. Excuse me. Giglio. Well, whatever it is. I have an Italian impediment. I'm sorry. The — What is your evidence that there was a deal for all the things that she — that she got after the trial? Well, I think the biggest part of it is the letter from Justice — from Justice of the Peace Jansen. Letter from Justice of the Peace? A notation that he made with respect to why he released her. Somebody contacted him. Right. And he said that she was working with Metro. Who contacted him? That would need to be developed. Well, you see, that's the problem. You can't come to us and say that would need to be developed. It seems to me that you're asking us to surmise there was a deal, but there's been no predicate laid for that. Did anybody get a hold of the officers and the prosecutors and the people who were involved in the case and develop an evidentiary hearing in the state court? Not one. And we were denied the evidentiary hearing. What did you present to the court to get an evidentiary hearing? Did you have declarations and affidavits? We presented the petition that was signed. It was — it was — it was a verified petition. But was there anything attached to it from any of the parties who might have given her a deal saying, yeah, we gave her a deal and it just never came out? We did not have that because we couldn't get them to cooperate with us. Did you try to subpoena them? We weren't given a hearing. There was nothing to subpoena them. So where are we going to go now? How many years later is this? Fifteen. And Frank D'Augustino is the one who knows that best. And there's no factual predicate for the proposition that there was a deal other than your surmise that there must have been? Well, it's not just mine. I think Justice Springer, in his dissent in the Nevada Supreme Court, addressed that issue as well. Well, that's — a dissent in a state court is not going to get us anywhere in terms of a factual basis for what you're asking for. I have always asked for an opportunity for an evidentiary hearing in this matter. Did you ask for one? And it's not surprising that we're not getting the cooperation of these law enforcers. Did you ask for an evidentiary hearing in the federal district court here? Yes, we did. And what was the answer to that? We didn't get it. Didn't get it. Did you attach any declarations or affidavits from any of the players to suggest that there was a deal on the battery and the prostitution and the trespass and all the other cases? Well, we submitted a copy, at least of Justice Springer's opinion, that there was sufficient evidence of a deal. It would seem to me that that's enough to raise an issue. How do we know that just isn't something that they gave her out of the goodness of their police heart after the case was over? Judge Trott, you were a prosecutor. Yeah, and I also — if that's a legitimate question, there were zillions of cases where there were no deals going in. And coming out then, people were given the benefit of the state's gratitude. Yes, but again, that is something that there is certainly an expectation of or a hope of. And without having the information to do the cross-examination, you can't bring it out. Did she have a lawyer during this? Was she a suspect in the murder? Absolutely. Not only did she have a lawyer — that's one of the ironies of this case. She was represented by the public defender's office, the same office that represented Frankie Augustine. And did you or anybody on behalf of your client ever get a hold of the public defender's office to find out if she had a deal? Those files were destroyed. That's not my question. I understand the files were destroyed. Did anybody get a hold of the lawyers that represented her? I can't answer that. Why not? I mean, they would seem to be the people who would know. I don't know. And, you know, I have to restate something. We did raise the issue of the concession in the petition, in the habeas petition that we filed. Hey, but it's not on appeal. Well, I would think that it was at least subsumed in the ineffective assistance. So right now, we really don't know if — you want a new trial, is that right, for your client? If I could get a new trial, that would be wonderful. But if I could at least get an evidentiary hearing, which I think this case absolutely requires, when you think about it, even on the question of what was said to — by Steve Wolfson to his client. I mean, I certainly am here advocating for Frankie Augustino. Was that one of your identified points on appeal, the failure to give you an evidentiary hearing in the district court? No. Well, you see, there we go again. I mean, if you didn't appeal that, then how can we give you something you didn't ask us for? Well, I think that the remedy is something that you have at your discretion. You don't necessarily have to reverse. You can — that happens all the time, that it's sent back for an evidentiary hearing to further develop a record. So it doesn't happen all the time when the issue isn't presented on appeal. I mean, we're not supposed to just go walking barefoot through the record and say, oh, maybe he should have had an evidentiary hearing. So, oh, let's just send it back. Right. But the court — as a matter of fact, in Florida v. Nixon, the Supreme Court sent it back to the Florida court for further hearings and further development on the record. So certainly if the United States Supreme Court — But the question is whether we should. It wasn't requested there. I mean, the question here is the question of doing justice, it would seem to me. And if we did not specifically ask for a remand for an evidentiary hearing, and because it doesn't specifically state that in the brief, we're not going to get that record, well, then I guess he's had ineffective assistance of counsel once more. In justice's process, the other side is entitled to stand up and agree or disagree that there should be an evidentiary hearing. With no notice, they got caught flat-footed. But let me move on to Mr. Gaines. You say that counsel was ineffective in failing to investigate the possibility that Gaines had manufactured the evidence by digging through records in the jail cells in Florida. Is that about it? That's about it. And there's a man named Roberts who's supposed to be able to say that Gaines was rummaging around in D'Agostino's records? That is what I am understanding, but I have not been able to find Mr. Roberts. We have — Mr. Roberts was a prisoner in Florida at the time. What was he charged with? I have no idea. What steps have been taken to try to find this man? We had signed an investigator about five years ago, when we started with this case, to try to find that man. And as of, I would say, probably a couple of years ago, he could not. What about Gaines — Not anything since then, because we've been in this litigation all the while. What about Gaines himself? Has anybody found him or looked for him? Well, Gaines testified. I know, but has anybody gone back to him? You know, half the time, these guys kick back and admit they made it up. I mean, has anybody tracked him down to see where he is or what he might say? In my experience, Judge Trott, that half the time, they kick back and — Check out Jesse Cisneros and Leslie Vernon White, and I'll give you a list of about 300 who have kicked back. Henry Harris in the Al Rukins case in Chicago. It's a huge list of them that turn around and go against the prosecutor. But in any event, we don't know what he's going to say or not say. Well, there has to — No, we don't. But there has to come a point — Where did this idea that Roberts could give us some information come from? There's no declaration or affidavit from him either that I could find. That had to come directly from Mr. D'Agostino. Had to come? It had to, because he would be the only one — We don't know. No, I know that it did. I know that the information came from Mr. D'Agostino. Is there an affidavit from Mr. D'Agostino in the file? Roberts told me he was rummaging through my papers when I was not in the cell. I do not think that that's in the pleadings. So if we go — if we were to send this back for a new trial, where are we with respect to Gaines and Roberts? It seems to me that you'd be unable to prove your point, and that is that Gaines stole information and manufactured a confession without Roberts, or without an affidavit, or — Unless you're right that 50 percent of the time he's going to kick back and change his mind. But we don't — you haven't even looked for him. I'm not criticizing you. I'm trying to figure out what the state of the play is in the case. You know, candidly, my take on the case would be to try it in a different fashion. I'm not so sure that they could present Gaines again. Perhaps because he was cross-examined, his earlier testimony would be admissible at this point. They might do better without presenting Gaines again, based on what the Nevada Supreme Court said about him with respect to the penalty phase. Yeah, it looks that way. Would you like to save your remaining time? I would. Okay. Mr. Haven. Good morning. May it please the Court, my name is Conrad Haven. I represent the Respondent in this appeal. There are three reasons why this Court should affirm the district court's order. First, the prosecutor did not engage in misconduct so as to violate appellants' due process rights. Second, the trial court's alleged conduct did not render the trial unfair. And third, trial counsel was not ineffective. In regard to the third issue, as mentioned by appellants' counsel, the Court, as this Court has mentioned, the case of Florida v. Nixon is the seminal case that addresses this particular issue. You didn't mention that case in your brief. That's correct. You didn't call it to our attention. That's correct. That was a case that, of all the other multiple cases that were briefed and attempted to be found, slipped the Respondent's attention. But the key case that they were working on was chronic. You had a per se prejudice rule against you, and I was kind of surprised that you didn't come up with Nixon, that we had to find it for you. Well, in any event, that's a case that now this Court has asked us to address, and I believe that it certainly applies to the ineffective assistance of counsel claim wherein they allege that Mr. Wilson conceded the guilt on the arson charge as well as the larceny. And as you address what Mr. Wilson did in regard to and compare that to what the defense attorney did in the Nixon case, it's clear that Mr. Wilson's strategy was a viable strategy. What do you say to your opposition's argument that this is different from Nixon, because, in effect, by making an agreement that the evidence is sufficient on the two crimes, he, in effect, is giving away the issue of the believability of two witnesses, which should be important. Well, I believe it is distinguishable from Nixon in the sense that what Mr. Wilson tried to do is tell the jury, yes, my client is guilty of arson after the murder had already been committed by Mr. Vera, and also my client is guilty of grand larceny, which was a lesser included charge of robbery with the use of a deadly weapon. He never conceded the murder, which is what the defense attorney did in the Nixon case. And so what he was attempting to do was he was attempting to present to this jury a plausible alternative, that my client went in there after the fact, saw an opportunity to take some jewelry, to take some money, and leave. But the body was already there. The murder had already been committed. And there's no evidence. In fact, I think Mr. Wilson indicated there were ten different points of conflict in the evidence that indicated that it was the other individual who actually committed the murder in this case. And I'm sure that Mr. Wilson, since this was a death penalty case, he probably could have conceded the fact that his client had committed the murder, and then just argued that he ought to be given life without the possibility of parole, as opposed to the death penalty, which is what the assistant public defender did in Nixon. But he didn't do that. He tried to save as much as he could any potential exposure that his client may have if he was found guilty. I understand that. And there is overwhelming evidence of his guilt. And I understand the very difficult position that counsel is in, trying to save as much as he can for persons on the brink of losing their life. But the argument that was raised against you, that this was a wrong choice under Strickland, because it gave away too much. It gave away the attack on witnesses, which would otherwise, that giving this away verified witnesses that were under attack. What's your specific response to that? Well, I don't believe it gave away too much. Mr. Wilson did a great job of cross-examining Rose Lakel. He did a great job of cross-examining Mr. Wells. And he exposed not only their deficiencies, as well as the Dills, particularly Rose Lakel case that she had with the state, but he pointed out a lot of deficiencies in the evidence. And the way that he cross-examined these individuals, particularly Mr. Wells, actually supported his subsequent theory that his client may have been guilty of arson. He may have been guilty of grand larceny, but he wasn't guilty of murder. And so he was actually able to, through cross-examination of Mr. Wells, set up that theory and point that out to the jury. Counsel argues that he set up motive by conceding larceny. Well, motive is something, as you know, that the State doesn't have to prove. I understand, but it's helpful. Absolutely. And I guess that's kind of a two-edged sword. I can certainly see where that would have set up the motive. But again, Mr. Wilson was placed in a very difficult position, Your Honor. He had to come up with some type of strategy to tell the jury that my client didn't commit this murder, that he came in after the fact. And the only way that he could get to that point is to explain to the jury that when he came into that apartment, that he saw a dead body and took an opportunity to take jewelry and money. And the only reason he committed the arson was to cover his tracks, because he thought that perhaps he was going to be then charged and accused of committing the murder. If that's the theory, that Mr. D'Agostino showed up after the murder and took the opportunity to steal the jewelry and then burned up the body just to try to cover up the theft and all that kind of stuff, it seems to me that the testimony of Gaines becomes even more important, because Gaines, the cellmate, comes in with a full confession, if you believe what he had to say, on the murder. Is that right? Well, that's correct, because as far as I can tell, the defense attorney who conceded all these things never lifted a finger to investigate the possibility that Gaines had manufactured this testimony. Is that right also? Well, in that regard, the record, I don't believe, is very clear. I don't know if Mr. Wilson traveled to Florida to talk with Mr. Gaines. Well, you know, I mean, if anybody who's at all experienced in law enforcement knows that in the 1980s a gigantic epidemic broke out in the United States of jailhouse snitches figured out the fastest way to get out of trouble is not hire Johnny Cochran or Mark Garagos or somebody like that, but call the sheriff and make a deal by snitching on somebody else. It was so bad that the Los Angeles County Grand Jury issued a report on 200 cases. Laws were changed all over the place. And this shouldn't come as any news to you, because your own Supreme Court took one look at this guy, Gaines, held their nose and threw out the entire penalty phase because they thought he was so untrustworthy. And so here we have a case where a guy comes in with a confession that reeks of potential manufacture. And the council doesn't do anything to try to dispute that. I mean, you're giving up all this information, say, yeah, he's guilty of all this and all that. And then you don't even investigate the possibility that the confession is bogus. Well, and again, I don't believe that the record is clear in regard to the extent of the investigation. Council says they asked for an evidentiary hearing on all this stuff and it was turned down. Is that right? Well, that's correct. At the state level, the judge, in viewing the record, determined that there was sufficient cross-examination. And as I understand it, the issue that was really presented to the state district court judge was the issue regarding Rose Lakel. And the judge, and it's in the record, indicated that she reviewed the trial record, indicated that Mr. Wilson did a... Yeah, I read all that. It's clear. There's a whole bunch of stuff that happened after the trial, I think. And their idea is that has to have been the result of a deal that was entered into before the trial. But what really I'm having trouble with is the idea of not even looking into a guy who's a criminal. This guy gains at a record six feet thick, classic career criminal. And the prosecutor brings this guy all the way out to Nevada to testify to this confession, a confession. And the defense attorney, as far as I can tell from this record, failed utterly to look into the possibility that it was manufactured. Well, he was certainly cross-examined at time of trial. And it's my understanding, and again, I know the court has asked for the jury trial record, and that will be provided. But it's my understanding that he was adequately cross-examined at those points. How are you going to cross-examine a perjurer who simply says he confessed? Well, that would certainly be... That's why it seems to me that you'd have to lay a predicate for that by showing through like Roberts or somebody else that the guy was rummaging around. This was standard stuff. You steal the guy's file. You get the facts. You call the cops. And it sounds like he must have confessed to you because you know facts that only the cops know from the scene. Well, what you do is you weigh that during cross-examination with his prior criminal history. You talk about a motive to the jury. You do all sorts of things. And again, whether Mr. Wilson actually went to Florida to interview Mr. Gaines or whether he was brought to Las Vegas, the record isn't clear on that. But he was cross-examined. His prior history was brought out. The jury had the opportunity to weigh his credibility. Where'd this guy Roberts come from? I don't know where Roberts came from. Apparently, he was an inmate there in Florida. Did anybody talk to him or subpoena him on behalf of the defense? I have no idea. That's something that Mr. Gentile would have to address. I mean, it's rather remarkable that the Supreme Court takes one look at Gaines' testimony and throws out the entire penalty phase and creates a new rule. We're not going to accept testimony from people like Gaines, these jailhouse snitches, without corroboration. We're not going to accept it. And this is a man who was never investigated by defense counsel. And I suppose if there was an evidentiary hearing at the time, Mr. Wilson could have answered those questions. But I've got to assume, based on the record, the fact that he was able to sufficiently cross-examine Rose Lakel, cross-examine her about all sorts of deals that she had with the state, with prosecution, that he had to have done some investigation in regard to Mr. Gaines. Either went in and talked to him or he had some type of information so at the time of the trial, when he cross-examined Mr. Gaines, that he was able to expose not only his prior history, but any type of motive that he may have had in regard to this testimony. Was Gaines getting some kind of a deal in return for his testimony? I don't believe so. And the record is not clear in that regard. Gaines had a lawyer, must have, if he was in jail in Tampa. That's correct. Was the prosecution dealing with his lawyer? I don't know. Again, the record is void of that. Those questions are not answered. But I guess when you get back to the question of whether this was truly ineffective assistance of counsel, this Court would have to look at everything that Mr. Wilson did in this regard. The evidence in regard to murder was very, very strong. It's hard to believe that it's not ineffective assistance of counsel to fail to investigate the source of a confession when the source is a guy like Gaines. Well, and again, I'm certainly not conceding that he failed to investigate. I didn't see anything in the record that addressed that issue because there was not a hearing in the State court to ask Mr. Wilson exactly what he did. But I can tell you this, that during the cross-examination of Mr. Gaines, Mr. Gaines' criminal history was certainly exposed. And so the jury had that information. I can certainly weigh that against the testimony that he was providing at this time. In addition to that, Your Honor, I think the Court also realized that Mr. D'Agostino was interviewed by the investigators there in Florida and made some very incriminating statements. He basically admitted that he had... Shouldn't have told his wife. That's correct. But in addition to that, as you recall in the record, he, after talking to the investigator, he turned to the investigator and basically said, well, I hope this is off the record. And there was no response there. He knew that he basically shrewd himself because of some of the statements that he had made to the investigator. So even if you look at inmate Gaines' testimony, that in and of itself was corroborated by a lot of other evidence that the State had. Again, Mr. Wilson had a difficult task that was presented to him, and I think he did the best that he could. Was Rose Lakel's initial explanation of what she knew about this murder to the police, to the Nevada police in Florida, consistent with her later testimony? There's an allegation that there's all kinds of inconsistencies that were not turned over to the defense. Well, as far as inconsistencies, are you talking about like the agreement that she had that wasn't turned over to the defense? I know that she testified somewhat differently... That's right. ...in the preliminary hearing than she did at time of trial, and Mr. Wilson was able to expose that on cross-examination. But again, in my mind, even though Mr. Gaines was able to come forward and say, hey, I was an inmate, this person confessed to me exactly what he had done, Rose Lakel was the key in this case. And one of the allegations is that Mr. Wilson was ineffective. Excuse me. One of the allegations is the prosecutor committed misconduct by not turning over certain information to Mr. Wilson, when, in fact, that information was turned over to Mr. Wilson prior to cross-examination. Specific information was, in fact, turned over and made use of in cross-examination. The amount of money that she was paid, the misdemeanor charges and felony charges that she had against her, the fact that she had entered into the secret witness program and was going to get $1,000. What was not disclosed was a deal she had with the prosecutors or with somebody else to dispose of several warrants. Well, well, that, as I understand the State record, during the trial, Lakel was asked several times about some type of agreement. She said she didn't have an agreement in exchange for her testimony. As you recall off the record, Mr. Wilson made the comment to the effect that, well, she may not believe that she's got an agreement, but law enforcement certainly believe that she, that they do have an agreement with her. Now. Because if she is your key witness and an agreement was not disclosed, that would sound a lot like it's prejudicial. Well, and I would agree with that if, in fact, there was some type of written agreement and it wasn't disclosed. But, again. Or an oral agreement. It doesn't have to be written. Well, that's true, Your Honor. But, again, Mr. Wilson cross-examined her on that. And I suppose, short of calling the prosecutor as a witness. Well, I'm not quite sure I follow whatever it makes if he cross-examined her on it. If he was denied the tools for effective cross-examination, which would have been the ability to say, well, yeah, but here it is, then I'm not sure I follow your point. Well, let me back up. It's my understanding from the record that the prosecutor and the State deny that there's ever any type of an agreement. That everything that they gave to Rose Lakel, they already informed Mr. Wilson about. Now, that's very suspicious. Because at the time of the trial, she had prostitution charges pending that were then cleaned up after the trial. She had battery charges pending that were then cleaned up after the trial. She had a grand larceny charge that was under negotiation that was cleaned up. She had trespassing pending that was cleaned up after the trial. And then all the files were destroyed that might cover this kind of a deal. So are you telling me we're supposed to believe that the police or the prosecution, out of the goodnesses of his heart, ran around and got her off of her battery, trespassing, misdemeanor, and prostitution charges after the trial was over with no deal? Well, two responses, Your Honor. First response is they have the burden to show that the State engaged in bad faith in destroying the files, and they haven't met that burden. How do you show bad faith? Well... Can you infer it from the fact that all of these cases disappeared and the files disappeared with them? Well, you know, if that was a standard of bad faith, then, you know, just about every case, if you can infer it. I think it requires more than that. I think it requires interviewing people, finding out exactly what those files may have contained. Were they just routinely destroyed according to a records destruction program in the office after three years we destroy everything? Is that how they got destroyed? I don't know the answer to that. That wasn't developed in the record below. But I would imagine, being familiar with the Public Defender's Office, as well as the Clark County District Attorney's Office, that there's probably some type of procedure where after a certain period of time, once a case has been resolved and closed, those records are destroyed. Was there any forensic evidence in this case at all that linked Agostino to these crimes, such as blood, DNA, fingerprints, fiber analysis, anything? Well, you had the credit card that was on his possession. You had blood. You had Rose Lakel testify that he had wrapped... I'm talking about forensic, where the experts come in and say, this links X to the murder or something like that. I don't believe that there was any DNA analysis that was performed. Rose Lakel certainly testified that what her husband did, how he came back several times into the apartment, wrapped the knife, put baking soda on it. Told her mother that he had confessed, is that right? I believe that she had called up the mother and told him that information, yes. And then the mother ended up testifying on behalf of the defense. But in addition to that, you've got Anthony Wells, who actually went to the apartment with Mr. D'Agostino. Did he get a deal in return for his testimony? There's nothing in the record to indicate that. I don't believe he did. Did he know this was stolen property that he was selling, that had been taken off at least a dead body, if not taken during a murder? Well, I believe that he had some indication of that, because after helping Mr. D'Agostino go into the apartment and help take care of the body, I know he saw a driver's license that D'Agostino had. Was he asked at any time if he was getting a deal in return for his testimony? No, there's no indication in the record that he was. I think the sequence of events here tells you a lot. Pre-trial, when Steve Wilson had to make up his decision in terms of what his strategy was going to be, he did not have the impeachment information on Rose Lakel. He makes a decision that he's going to concede essentially guilt on two aspects of this case that provide the motive and at that point in time are going to enhance the credibility. He may not have been thinking that way, but nevertheless, it's inevitable. He makes that in opening statement and it isn't until after he's committed to that, sometime mid-trial, that he gets some but not all of the impeachment information on Lakel. That makes a difference. By that time, this really became a problem. He had a whole lot of impeachment and he did, in fact, impeach her pretty severely. What difference would a little bit more have made? It may have made the difference in determining whether to attack her credibility in general and not concede anything that she was saying was true. I think a good lawyer can make that decision. Sorry, that loses me. He makes his strategy, he makes his decision on his strategy before he has all of the impeachment material. I don't get that either. I mean, a lot of times the opening statement is one thing. What do you do in closing? I'm sure he had the same thing in closing. By that time, he had committed to his theory. He committed to his theory in opening and he did so without talking to his client. So Wells becomes consistent with the defense. Is that your idea? It would seem that way to me. Except he told him. I would have, well, I don't want to talk about what I would have done. That's easy to do and it's not fair to Steve Wolfson. But my point is that I think the sequence of events here actually exacerbates the problem and the prejudice. Had he had the information pretrial, which he should have had, I don't think there's any dispute there, then he may not have made the decision. He wouldn't have had to talk to his client about it. But once he made the decision, albeit with less than full information, he certainly had a duty to talk to his client about it. Secondly, it rose to a level where in the summation, Mel Harmon called this, Mel Harmon was the prosecutor, called this theory, the defense theory, absurd in terms of being able to concede the arson and concede the grand larceny, but somehow say that does not establish evidence of the motive for the murder. And he argued that the overwhelming evidence, it may have been absurd, the whole thing may have been absurd. Wasn't he taking a legitimate risk, making a legitimate strategy decision that his best way to take advantage of what Wells has said was to concede, sure, he was there, arson, there for the larceny, but he was not there for the murder, boyfriend-wise. Well, you know, I suppose different points of view can be made and taken on that,  different points of view can be made, then why was the decision contrary to clearly established? Because he didn't tell his client that he was making it. That's the law. No, but if it can go either way, it's a reasonable strategic decision, yes? No. No. Not without telling your client. If you're going to talk about conceding. Based that on appeal, so that's out of here. So the question is, is it a legitimate strategic decision? Are you saying that a lawyer – is it a legitimate strategic decision under certain facts for a lawyer to concede guilt as to some aspects of a charge? I can't say that it never is. I can't say that it never is. I think it's fact-specific. All right. Thank you. Your time has expired. Counsel, we appreciate your argument. The matter just argued will be submitted.
judges: Wallace, Trott, Rymer